ROBERT W. WOODS, Plaintiff-Appellee, v. GRAHAM ENGINEERING CORPORATION, Defendant and Third–Party Plaintiff-Appellant (American Can Company, Third–Party Defendant-Appellee).

Second District   No. 2—88—0564

Opinion filed May 17, 1989.—Rehearing denied June 19, 1989.

338

George E. Krippner, of Clancy & Krippner, of St. Charles (Kathleen M. Krippner, of counsel), for appellant.

Jay R. Wyeth, of Lindner, Speers & Reuland, P.C., of Aurora, and William A. Delaney II, of Geneva (Timothy J. Reuland, of counsel), for appellee.

JUSTICE INGLIS delivered the opinion of the court:

This is a products liability action which arises out of an industrial accident wherein plaintiff, Robert W. Woods, had his hand injured in a plastic injection blow molding machine manufactured by defendant, Graham Engineering Corp. (Graham). The jury rendered a verdict for plaintiff upon which the trial court entered a judgment in the amount of $215,000. Graham appeals.

On appeal Graham contends (1) that it is not liable because an alteration made by plaintiff's employer, American Can Company, was the cause of the injury; (2) that American Can's removal of safety devices on the machine was unforeseeable as a matter of law; (3) that the trial court erred in its ruling relative to jury selection and conduct; (4) that the trial court erred with regard to certain rulings concerning jury instructions; and (5) that the trial court erred in striking defendant's third affirmative defense requesting a setoff. We reverse.

Plaintiff, Robert W. Woods, was injured while operating a machine system which made plastic bottles. Part of the system, known as a "Graham wheel," was manufactured by defendant Graham.

The Graham wheel contains 12 molds. Each mold has two halves. The molds revolve clockwise similar to a Ferris wheel. As the wheel rotates, the molds open and close. At the 9 o'clock position the mold is open. At that point, melted plastic, called parison, is injected into the mold through a machine known as an extruder. The mold then closes upon the parison, and the mold is entirely closed at the 12 o'clock position. The mold starts to open at the 5 o'clock position, and the molded product, a bottle, is ejected onto a conveyor at the 6 o'clock position. When the mold is fully open there is about 1 to 1½ feet between the two halves.

According to plaintiff, just prior to his injury, he observed a bottle

stuck in a mold. He watched for a period of time and then put his legs over the frame and sat on the frame. As the stuck bottle came around, plaintiff reached in and attempted to remove it at about the 6 o'clock position. Plaintiff tried yanking the bottle, but it would not come out. When the mold came around again, plaintiff again attempted to remove the bottle. On this occasion, the mold closed on plaintiff's hand and then opened back up.

Part of the wheel's design includes a cam with a large opening. There was testimony that if a product did not come out at the 6 o'clock position and more parison was injected into the mold, the mold would not completely close. However, even in this state there would be a time near the 5:30 o'clock position where the mold would close. This closure would occur due to the way a rod on the mold tracks the cam. There was also testimony that there was no such thing as a jam-free machine.

Ordinarily the Graham wheel is a component part of the Graham blow molding system, which consists of three major components: an extruder, which is the source of the plastic, the Graham wheel, and a conveyor belt to remove the product. As designed, an operator-access doorway to the wheel is provided at the front of the wheel between the extruder and the wheel. The doorway is electronically interlocked with limit switches such that if the doors to the access are opened or not in place, the limit switches shut off the wheel.

The rear of the wheel, where plaintiff accessed the mold, is guarded by perimeter steel mesh guards bolted to the frame. There is, however, an opening left at the side of the wheel to accommodate a conveyor. The guards on the wheel contain the following warning: "DO NOT OPERATE WITHOUT THE GUARDS IN PLACE." A manual provided with the machine contains the following warning:

> *"This machine, designed to rotate in order to perform its task, is potentially dangerous, and can cause injury, if the operator becomes negligent or is not properly trained. It must be stressed that every precaution must be taken when making adjustments to the machine while running.* Warning signs are affixed to the machine at various points. These must not be removed at any time for any reason!" (Emphasis in original.)

The complete system was offered to American Can. However, American Can only purchased the wheel and used a conveyor built by another manufacturer and an extruder designed and built by itself. At the time of the sale, Graham knew that the extruder being used by American Can was larger than the one that Graham sold with the wheel and that the larger extruder would require modifications to the

front of the machine and the front entry. Graham also knew the only way to enter the molder with American Can's extruder was to take the doors off altogether, but the exact details were a secret and not revealed to Graham.

There was testimony by Matt Branock, an employee of American Can, that development of American Can's extruder was a secret and a major breakthrough in plastic-molding process. Branock testified that American Can never wanted its competitors to know what was going on inside its facilities and that Graham is a competitor. American Can therefore kept details of the extruder secret.

As the wheel was delivered, the doors were left off. Graham, however, left the limit switches in place so that American Can could attach doors of its own. The wheel, as shipped, also contained the guards in the back.

American Can's extruder blocked the front or right access doorway of the wheel. American Can engineers designed their own access by building a platform on top of the extruder such that an operator could stand on the platform above the extruder in order to access the wheel for purposes of removing a stuck product. It was intended by American Can that an operator would use a stick and knock the stuck product out while standing on this platform while the wheel was in the 6 to 9 o'clock positions.

American Can took the interlocks off the access doorway and removed the fixed perimeter guards on the sides and rear of the wheel. The guards had been cut off with a torch or cutting tool. Further evidence showed that removal of the interlock would have to be done by an electrician who would have to remove the interlocks located at the top of the access doorway on the extruder side only after getting up on a ladder. After removing the interlocks, the electrician would then have to deactivate the control panel where the switch was in contact. To remove the fixed guards from the rear, a hand wrench could be used.

At the time of plaintiff's injury, the wheel was under the control of a research and development team from American Can that was responsible for setting up the entire system. During this time, engineers customarily worked with a lot of safeguards not in place.

There was testimony by Robert E. Tarosky, an expert for plaintiff, that it could be anticipated that the exterior guards would be removed during times when there was a high frequency of bottles sticking in the molds and that the guards would then be left off.

Norris Yonker, an expert for defendant, testified that it was foreseeable that the guards could be removed, but not by an operator.

The jury returned a verdict in favor of plaintiff in the amount of $215,000 upon which judgment was entered.

Defendant contends that as a matter of law alterations made by American Can were a subsequent intervening cause of plaintiff's injury which relieved it of liability. We agree.

■ To recover against a manufacturer under strict liability, a plaintiff must prove that his injury resulted from an unreasonably dangerous condition of the product that existed at the time the product left the manufacturer's control. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342; *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623.) Where the injury is caused by an alteration of a third party which is unreasonably dangerous, the original manufacturer is not liable. (*Augenstine v. Dico Co.* (1985), 135 Ill. App. 3d 273, 276; *Coleman v. Verson Allsteel Press Co.* (1978), 64 Ill. App. 3d 974, 978.) Where, however, a change is foreseeable, liability will still be imposed on the original manufacturer. See *Foster v. Devilbiss Co.* (1988), 174 Ill. App. 3d 359, 363.

In the instant case, the Graham wheel, as designed, had a door at the front which had interlocks that would stop the wheel when the doors were opened. It was at this point that an operator could access a mold if there was a stuck product. It is evident that had access been made at this point with the interlocks in place, the wheel would have stopped rotating, and the mold would not have closed, as closure occurs when a certain point is reached in the rotation. As delivered, the point at which plaintiff accessed the mold had guards over it. With the guards in place, plaintiff could not have accessed the mold as he did.

■ Although the engineers at Graham knew that the extruder used by American Can would be accessed through the doors and that the doors were therefore left off, we nevertheless find that such facts are not the basis of liability on the part of Graham since Graham delivered the wheel to American Can more as a component part than as a final product. While it is clear that the manufacturer of a component part may be held liable under strict liability (*Suvada*, 32 Ill. 2d at 623), such a manufacturer will not be held liable if the injury resulted from a dangerous condition created by the party who created the final product.

" 'The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not *** extend to the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a

unit designed, assembled, installed, and sold by another.' " *Curry v. Louis Allis Co.* (1981), 100 Ill. App. 3d 910, 915-16, quoting *Jordan v. Whiting Corp.* (1973), 49 Mich. App. 481, 486, 212 N.W.2d 324, 328, *modified* (1976), 396 Mich. 145, 240 N.W.2d 468.

See also *Loos v. American Energy Savers, Inc.* (1988), 168 Ill. App. 3d 558, 563.

It is apparent from the evidence that Graham was not responsible for design of the final system. Rather, design of the final system was left to American Can. Yet, even were we not to find that the wheel was a component part, we would still find that Graham is not liable.

In *DeArmond v. Hoover Ball & Bearing* (1980), 86 Ill. App. 3d 1066, 1071, the court indicated that what was important was not whether the guards are easily removable, but rather, whether they are easily removable by the operator. In *DeArmond*, the court focused on the fact that safety doors had not been removed by the operator and also found that the safety doors which were attached by eight quarter-inch bolts and a rod were not easily removable by the operator. (86 Ill. App. 3d at 1071.) In so doing, the court upheld a summary judgment in favor of the manufacturer. 86 Ill. App. 3d at 1071.

■■ Although the wheel in the instant case was shipped to American Can without the safety doors, it was shipped with the back guards in place and with interlocks in place such that it could not be operated until the safety doors were put in place or the interlocks were overridden. The evidence showed that neither overriding the interlocks nor the removal of the back guards were acts that could be easily accomplished by an operator. Testimony indicated that removal of the interlock would have to be done by an electrician who would have to get up on a ladder to accomplish the removal, and, after removing the interlocks, the control panel would also have to be deactivated. Removal of the back guard would require the use of a hand wrench to remove numerous hex head screws which affixed the back guards. Moreover, the evidence showed that removal of the back guard was not even done by removing the screws, but rather cut off with a torch or cutting tool. Consequently, we find that it was not reasonably foreseeable that an operator could remove the safety devices attached to the machine and that Graham is therefore not liable. See *DeArmond*, 86 Ill. App. 3d at 1071.

■■ ■ Finally, the import of all design cases is that the manufacturer is to be held liable only when it is the manufacturer that is responsible for the design of the final product or the component part of the product that caused the injury. Although plaintiff claims that the

design failure that caused the injury was the open-close-open sequence of the mold, this is not the proper focus. The evidence showed that the reason for the sequence was the way in which the guides followed the cam and that proper operation of the wheel required the cam to be designed as it was with a large opening. The open-close-open sequence was therefore not itself a design defect. The design defect was rather the lack of a guard that prevented access to the mold at the point where it went through this sequence. Even though it may have been foreseeable that American Can was going to change the design, we find that because the design change was so extensive, Graham should be relieved of responsibility for the design of the wheel where there actually was a change made by American Can. This case differs from cases where there was just the removal of a guard to facilitate the operation of the product as it was designed by the manufacturer. (See *Foster*, 174 Ill. App. 3d at 363.) In this case, removal of the guard may have been to facilitate operation of the product, but it was occasioned by a major change in the design by American Can: the placing of an extruder which blocked entry through the front of the wheel where there had been safety doors with interlocks. Where such a change is made, it is reasonable to put responsibility for safe access upon the party who was responsible for the design change. We therefore find as a matter of law that the alteration of the product manufactured by Graham was unforeseeable and therefore Graham is not liable for plaintiff's injury.

Because our ruling on this issue is dispositive, we find that we need not address defendant's remaining contentions.

In accordance with the above analysis we reverse the judgment of the trial court.

Reversed.

NASH and WOODWARD, JJ., concur.